IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PAUL SULLIVAN, § | |
| § | |
| Plaintiff, § | |
| § | |
| V. § | No. 3:21-cv-915-S-BN |
| § | |
| CITY OF DALLAS, TEXAS and § | |
| JENNIFER NICEWANDER, § | |
| § | |
| Defendants. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference from United States District Judge Karen Gren Scholer. *See* Dkt. No. 1.

Defendant City of Dallas, Texas has filed a motion for summary judgment. *See* Dkt. No. 78. Plaintiff Paul Sullivan has filed a response, *see* Dkt. No., 93, and the City has filed a reply, *see* Dkt. No. 98.

For the reasons explained below, the Court should grant the motion for summary judgment.

**Background**

I.  Sullivan allegedly blows the whistle.

Paul Sullivan began work in the City's Department of Public Works on June 10, 2015. *See* Dkt. No. 80-6 at 41 (App. 278). His direct supervisor was Jennifer

Nicewander, Senior Program Manager, *see* Dkt. No. 80-2 at 1 (App. 168), and Robert Perez was the Department Director, *see* Dkt. No. 80-3 at 1 (App. 177).

Beginning in 2018, the Department developed a five-year Infrastructure Management Program ("IMP") for fiscal years 2019-2023 concerning street reconstruction, maintenance, and preservation. *See* Dkt. No. 80-2 at 2 (App. 169); Dkt. No. 80-3 at 4 (App. 180). This five-year street repair program included a review of the City's Pavement Condition Index ("PCI") ratings and proposed annual budgets for the IMP. *See id*. At the beginning of each fiscal year, the Department Director would present to the City Council the five-year goals of the IMP and the proposed budget for the upcoming fiscal year. *See* Dkt. No. 80-2 at 3 (App. 170).

This IMP was to be funded through City bonds for Street Reconstruction and Servicing and the Department's maintenance budget sourced from the City's General Fund. *See* Dkt. No. 80-3 at 4 (App. 180). Sullivan knew federal funds were also used to repair and build city streets and believed the IMP was funded by federal funds. *See* Dkt. No. 94-1 at 6 (App. 6); 94-5 at 3-5 (App. 62-64).

As part of the IMP for FY 2019-2023, the City contracted with an outside vendor, Furgo Roadware, Inc., for pavement analysis services. *See id*. This analysis included Furgo inspecting the relevant Dallas roads and producing a PCI score, which is a raw number that provides a snapshot of the health of the road. *See* Dkt. No. 80-2 at 2 (App. 169).

Prior to the contract with Furgo, road conditions and related PCI information was

compiled and provided by Public Works employees. *See id.* In its contract, Furgo agreed to independently perform these inspections and produce its own PCI score calculations to the City. *See id.* Furgo would take PCI information from the City and provide a blended PCI. *See id.*

Generally, a lower PCI score indicates that the road is in worse shape and needs more resources for its maintenance or improvement. *See id.* The PCI score is used to provide a general estimate of the condition of the road or road segments. *See id.* The general condition of the road, in turn, affects the estimate of the budget required to meet various long-term goals regarding pavement condition levels. *See id.*

Sullivan was a GIS Analyst II. *See* Dkt. No. 80-1 at 7 (App. 007); Dkt. No. 80-2 at 3 (App. 170). His responsibilities as a GIS Analyst included analyzing the accuracy of PCI scores and providing this information to Department management as part of their budgeting procedures. *See id.*

Sullivan raised concerns about the accuracy of Furgo's PCI data.

Sullivan sent an email to Robert Perez on June 9, 2018:

> Our sampling of subsegment pic [sic] data indicated a disparate amount in the pic [sic] street scores. Cosmin discovered this last week that the Furgo data actually improved the score at an impossible rate. He showed me his data and I concurred that the information/data we have received so far will generate modeling and analysis that may not be accurate.

Dkt. No. 80-1 at 120 (App. 121). Sullivan stated that he had previously raised the issue with his direct supervisor, Nicewander. *See id.*

On June 11, 2018, Sullivan met with Perez, Nicewander and Cosmin Spiridon

-3-

(the other GIS Analyst II) to discuss the alleged Furgo data discrepancy. *See* Dkt. No. 80-6 at 4 (App. 241). Before the meeting, Sullivan sent Perez an email explaining that "[i]t is most probable that Furgo's system is not factoring the deterioration curve in these numbers. If this is true for the past, how can they model forwards in the future." Dkt. No. 94-2 at 3. He also sent Perez and Nicewander a spreadsheet of the alleged PCI discrepancies. *See* Dkt. No. 80-1 at 121-22 (App. 121-22).

On June 12, 2018, Sullivan sent Perez an email requesting that GIS analysts report directly to the assistant director instead of Nicewander. *See* Dkt. No. 80-1 at 123 (App. 124). Sullivan was concerned that his job was at risk after taking his "concerns regarding data integrity and that the model projections may be substantially off as a result" directly to Perez. *See id*.

On June 15, 2019, Sullivan sent Thomas Burchett with Furgo an email with questions concerning the blended PCI scores. *See* Dkt. No. 94-2 at 9.

On June 18, 2018, Sullivan, Nicewander, Spiridon, and Burchett discussed Sullivan's concerns regarding the accuracy of Furgo's PCI scores. *See* Dkt. No. 80-2 at 3 (App. 170). During the meeting, the Furgo representative explained the methodology for calculating the blended PCI scores. *See* Dkt. No. 80-1 at 123 (App. 124). Sullivan made no references to fraud or federal funds during the meeting. *See id*. at 59-60, 62 (App. 60-61, 63); Dkt. No. 80-2 at 4 (App. 171); Dkt. No. 80-3 at 5 (App. 181).

Later that day, Nicewander sent a follow-up email to Sullivan and Spiridon to confirm that they all concurred that the data provided by Furgo conformed to the

-4-

methodology accepted by the City. She also stated that it was her understanding that the Furgo blended PCI scores were within an acceptable standard of tolerance. *See* Dkt. No. 80-2 at 6-8 (App. 171-73) (Nicewander memo and Sullivan's and Spiridon's confirmation emails).

On March 8, 2019, Sullivan sent an email to three City Council members titled "Problems in PMP Street Analytics," which addressed "major discrepancies in the data we received from Furgo." Dkt. No. 80-1 at 152 (App. 153). He informed the councilmembers that it was his responsibility to vet street data and that the PCI data received from Furgo was "significantly off or skewed." *Id*. Sullivan also stated that he had informed Nicewander and Perez that use of the Furgo data could increase financial budget projections for street repairs by $100 million to $300 million over four to five years. *See id.*

On April 1, 2019, Sullivan was suspended without pay for five days. *See* Dkt. No. 80-6 at 19-21 (App. 256-258). In the Notice of Suspension, Nicewander explained:

> On June 13, 2018, during a meeting with you, Robert Perez, Director, and Don Spear, HR Business Partner, I instructed you to contact me with project concerns before contacting Mr. Perez directly. You were also instructed to copy me on emails when contacting Mr. Perez about issues within Pavement Management, and to follow your chain of command. You agreed that you would do this moving forward. Furthermore, on March 7, 2019, you received a letter of counseling for failing to follow these instructions. At that time, the importance of following these instructions was once again explained to you.
>
> Nevertheless, on March 8, 2019, during working hours, you once again disregarded my instructions by directly emailing Councilmembers, bypassing myself, Mr. Perez, and the City Manager's Office. In your emails, you falsely claimed that PCI data was not calculated correctly and

> that I was willfully and intentionally misleading executive staff. You made these false claims despite the fact that on June 18, 2018, after we spoke with the Furgo representative, you and your fellow GIS Analyst II Cosmin Spiridon both agreed that the blended PCI data provided by Furgo conformed to the standard methodology for this calculation.

*Id.* at 19 (App. 256).

On April 12, 2019, Sullivan sent a letter of apology to Nicewander, Perez, and the Assistant City Manager, apologizing for sending the email to the councilmembers. *See* Dkt. No. 80-1 at 154-156 (App. 154-56). He also apologized for mischaracterizing the accuracy of the PCI scores. *See id.*

## II.    The reduction in force and Sullivan's termination

The City defines a "reduction in force" ("RIF") as a reduction in the number of budgeted positions due to a change in work funds. *See* Dkt. No. 80-11 at 2 (App. 439); *see also id.* at 1-4 (App. 438-41) (City Personnel Rules), Dkt. No. 80-13 (Dallas City Code) and Dkt. No. 80-14 (Administrative Directive 3:52: Reduction in Force) (City procedures for reduction in force).

Once the decision is made and approved to eliminate a position pursuant to a RIF, the Civil Service Department provides the departments a RIF Seniority List sorting employees from least senior to most senior based on the last permanent appointment date. *See* Dkt. No. 80-3 at 8 (App. 184). The termination of an employee's employment in the RIF process is based on this Seniority List. *See id.*; Dkt. No. 80-13 at 5 (App. 448).

Employees affected by a RIF are given a minimum of 45 days' notice. *See id.*

Following notification of the RIF, Civil Service and Human Resources will attempt to aid the affected employees obtain other employment. *See id.*

In March 2019, following the merger of the City's former Department of Street Services into the Department of Public Works, as part of its FY 2020 budget process, the Department of Public Works began evaluating its Geographic Information Services ("GIS") program, including what positions were needed moving forward. *See* Dkt. No. 80-3 at 2 (App. 178). The Department of Public Works had acquired additional GIS positions during the merger and, as a result, had five GIS positions, including one GIS Analyst I, two GIS Analyst II (one of which was Sullivan's position), one GIS Analyst III and one Senior GIS Analyst. *See id.* It was determined that the GIS program would better serve the department's needs if reconfigured by eliminating the GIS Analyst I and the two GIS Analyst II positions and by adding a GIS Analyst III position.

On April 12, 2019, the Public Works Department's proposed FY 2020 budget, including the recommended reduction of the GIS positions, was sent to the City's Office of Budget for consideration. *See id.* at 2-3 (App. 178-179). The proposed changes were approved. *See id.* at 3 (App. 179). In July 2019, all budget initiatives, including the positions to be reduced in the RIF, were finalized by the Office of Budget for the FY 2020 proposed budget. *See id.*

In addition to the three GIS Analyst positions, two Compliance Coordinator positions and three Laborer positions were also eliminated as part of the RIF. *See id.* at 2-3 (App. 178-179). At the time the RIF was executed, four of the eliminated positions

were filled, including Sullivan's GIS Analyst II position. *See id.* at 3 (App. 179). Some positions, like the GIS Analyst I position, had been vacated and not been filled. *See id.*

On August 7-9, 2019, pursuant to the City's RIF procedures, the Director of the Department of Public Works coordinated with the City's Department of Civil Service to obtain seniority lists for the Department of Public Works' filled positions that were subject to the RIF. *See id.* The Department of Civil Service provided the requested RIF Seniority List, which identified Paul Sullivan as one of the individuals designated for layoff. *See id.*

Cosmin Spiridon applied for the newly-created GIS Analyst III position and received notification of his promotion to this position on August 12, 2019. *See id.*

The Department originally scheduled meetings for August 13, 2019 to individually notify employees affected by the RIF, including Sullivan. *See id.* Because Sullivan missed both the meeting scheduled for August 13, 2019 and the rescheduled August 19, 2019 meeting, a copy of the RIF paperwork was emailed to him on August 19, 2019. *See id.*

On October 2, 2019, Sullivan asked Nicewander to consider him for the GSI Analyst III position. He was informed that there was no open position at that time. *See* Dkt. No. 94-1 at 8 (App. 008); *see also* Dkt. No. 80 at 35 (App. 273).

Sullivan was terminated on October 3, 2019. *See* Dkt. No. 80-1 at 156-57 (App. 157-58).

In March 2022, the City rehired Sullivan to a position in a different department

with a higher salary. *See* Dkt. No. 80-1 at 115 (App. 116); Dkt. No. 80-6 at 39-41 (App. 276-78).

III. <u>The lawsuit</u>

In his Fourth Amended Complaint, Sullivan asserts claims against the City for retaliation under the False Claims Act ("FCA") and the Family and Medical Leave Act ("FMLA"). *See* Dkt. No. 54. Sullivan alleges that the termination of his employment was in retaliation for protected activity under the FCA and for exercising his rights under the FMLA. *See id.*

Sullivan subsequently abandoned his FMLA claim. *See* Dkt. No. 93 at 9 n.1.

The City seeks summary judgment on Sullivan's FCA retaliation claim and argues that Sullivan cannot demonstrate that (1) he engaged in protected activity pursuant to the FCA, (2) the City was aware of any alleged protected activity, (3) he was terminated because of any alleged protected activity, or (4) the City's legitimate, non-retaliatory reason for the elimination of Sullivan's position was pretext for retaliation.

**Legal Standards**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). "A factual dispute is

'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (cleaned up).

"Once the moving party meets this burden, the nonmoving party must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *accord Pioneer Expl.*, 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." (cleaned up)).

The Court is required to consider all evidence and view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party – but only if the summary judgment evidence shows that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Pioneer Expl.*, 767 F.3d at 511; *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Lynch Props.*, 140 F.3d at 625. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. While the court must disregard evidence favorable to the moving party that the jury is not required to believe, it gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (cleaned up). And "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston,* 337 F.3d 539, 541

(5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little*, 37 F.3d at 1075; *accord Pioneer Expl.*, 767 F.3d at 511 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (cleaned up)). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up).

Rather, the non-moving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pioneer Expl.*, 767 F.3d at 511 (cleaned up). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact." *Scott*, 550 U.S. at 380 (cleaned up). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *DIRECTV, Inc. v. Minor*, 420 F.3d 546, 549 (5th Cir. 2005) (cleaned up). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (cleaned up).

The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (cleaned up).

**Analysis**

I.  The Court should grant summary judgment on the Family Medical Leave Act Claim because Sullivan has abandoned the claim.

In his response to the motion for summary judgment, Sullivan states that he "is not proceeding with his FMLA claim." Dkt. No. 93 at 9 n.1. "When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned." *Windsor v. Olson*, No. 3:16-cv-934-L, 2019 WL 2080021, at *9 (N.D. Tex. May 10, 2019) (citing *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006)).

Since Sullivan has abandoned his FMLA claim, the Court should dismiss it with prejudice. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (explaining that a plaintiff, "in his opposition to a motion for summary judgment cannot abandon an issue and then ... by drawing on the pleadings resurrect the abandoned issue.").

II. The Court should grant summary judgment on the False Claims Act claim.

The federal False Claims Act "prohibits making fraudulent claims for payment" to the United States. 31 U.S.C. § 3729(a). "To enforce this prohibition, the FCA creates a cause of action for any person retaliated against by his employer for attempting to prevent an FCA violation." *Riddle v. Dyncorp Int'l Inc.*, 666 F.3d 940, 941 (5th Cir. 2012) (citing 31 U.S.C. § 3730(h)).

To establish a prima facie case under Section 3730(h), the employee must show (1) that he engaged in protected activity; (2) that the employer knew about the protected

activity; and (3) retaliation because of the protected activity. *See Nichols v. Baylor Research Institute*, 418 F. Supp. 3d 143, 148 (N.D. Tex. 2019) (quoting *Thomas v. ITT Educ. Services, Inc.,* 517 F. App'x 259, 262 (5th Cir. 2013)).

Courts apply the *McDonnell Douglas* framework to FCA retaliation claims. *See Garcia v. Prof'l Contract Services, Inc.*, 938 F.3d 236, 241 (5th Cir. 2019). "Once an employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Id.* (cleaned up). "After the employee provides that benign reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* (cleaned up).

And, so, first, Sullivan must demonstrate that he engaged in protected activity. The Fifth Circuit has confirmed the overarching principle that "[a] protected activity under the FCA is one motivated by a concern regarding fraud against the federal government." *Thomas,* 517 F. App'x at 262 (citing *Riddle,* 666 F.3d at 941); 31 U.S.C. §§ 3729(a), 3730(b)(1).

Other than Sullivan's own unsupported, conclusory allegations, there is no evidence that his reports about Furgo's PCI scores were made to prevent the City from making false or fraudulent claims for payment to the federal government. Instead, the substance of his complaints focused on the accuracy of Furgo's PCI scores.

Reporting alleged inaccuracies, without more, is not the same as attempting to expose fraud and does not constitute protected activity. *See Nichols*, 418 F. Supp. 3d at 150. For example, an employee's reports of allegedly substandard practices or the

quality of work provided to the government is not protected under the FCA. *See U.S. ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219, 221 (5th Cir 2015). Nor does "[m]ere criticism" of the employer's methods of conducting business, without any suggestion that the employee was attempting to expose illegality or fraud within the meaning of the FCA, rise to the level of protected activity. *U.S. ex rel. Patton v. Shaw Services, L.L.C.*, 418 F. App'x 366, 372 (5th Cir. 2011).

For internal complaints to constitute protected activity, the complaints must concern false or fraudulent claims for payment submitted to the government. *See id.* The key inquiry is whether the internal complaints to the employer raise concerns about fraud committed against the government. *See Nichols*, 418 F. Supp. 3d at 149.

Here, they do not. Even construing the facts in Sullivan's favor, his conclusory statements that federal funds were used to pay for street repair are not sufficient to raise a fact question as to whether he engaged in protected activity by reporting concerns about the accuracy of Furgo's PCI scores.

But, even if they did, the City did not know about the alleged protected activity. To establish the second element of an FCA claim, Sullivan must show that he put the City "on notice" of an FCA violation. *See United States ex rel. Johnson v. Raytheon Co.*, 395 F. Supp. 3d 791, 798 (N.D. Tex. 2019). To put the City of notice through internal reporting, the employee must specifically tell the employer that he is concerned about possible fraud. *See id.* It is insufficient for Sullivan to show that the City knew that he had concerns about the Furgo PCI scores or their potential effect on the IMP budget;

Sullivan must show that the City was on notice of the distinct possibility of an FCA claim. *See Jamison v. Fluor Fed. Sols., LLC*, No. 3:16-cv-441-S, 2019 WL 460304, at *5 (N.D. Tex. Feb. 6, 2019).

As Sullivan acknowledges, raising concerns about potential inaccuracies in PCI data was part of his job duties as a GIS Analyst II. *See* Dkt. No. 80-1 at 7 (App. 007), 11 (App. 011), 13 (App. 013), 152 (App. 153). Sullivan did not mention fraud in his communications with his chain of command or the City Council members. *See* Dkt. No. 80-1 at 120-23 (App. 120-23), 152 (App. 153); Dkt. No. 80-2 at 4 ¶11 (App. at 171), 6-8 (App. 173-76); Dkt. No. 80-3 at 5 ¶¶ 17-19 (App. 181). After raising his concerns and in follow-up meetings with Perez and Nicewander, Sullivan agreed that the Furgo PCI scores conformed to the methodology accepted by the City and were within an acceptable standard of tolerance. *See* Dkt. No. 80-3 at 5 ¶¶ 17-19 (App. 181). He later conceded that the information provided by Furgo was "mathematically correct" and "the most detailed and accurate prediction models in City history." Dkt. No. 80-1 at 155 (App. 156).

Sullivan argues that the City knew about his alleged protected activity because it fired him in retaliation for sending the letter to the city councilmembers. But, since the letter did not advise the councilmembers of fraud against the federal government, it did not put the City on notice of protected activity.

And, so, Sullivan has failed to raise a fact question concerning whether the City knew about the alleged protected activity.

To establish the third element of his prima facie case, Sullivan must show that he was terminated, at least in part, because of his protected activity. *See United States ex rel. Moore v. City of Dallas, Tex.*, No. 3:09-cv-1452-O, 2011 WL 4912590, at *5 (N.D. Tex. Sept. 27, 2011). The City asserts that there was no causal connection between Sullivan's termination and any alleged protected activity because Sullivan was terminated as part of a reduction in force.

Sullivan argues that the temporal proximity of his most recent alleged protected activity, sending the March 8, 2019 letter, and his termination shows a causal link sufficient to raise a fact question on causation.

Temporal proximity between protected activity and alleged retaliation is sometimes enough to establish causation at the prima facie stage. *See Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs,* 810 F. 3d 940-948-49 (5th Cir. 2015). When temporal proximity is "very close," proximity alone suffices to establish causation in a prima facie case of retaliation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

Sullivan argues that he engaged in protected activity beginning in June 2018 through March 8, 2019, when he sent the letter to the City Councilmembers. He was notified of the elimination of his position as part of the RIF in August 2019 and was terminated as part of the RIF in October 2019.

But the time between the most alleged protected activity and the adverse employment action is not close enough to raise a fact question concerning the causation

element of the prima facie case. *See Besser v. Tex. Gen. Land Office*, 834 F. App'x 876, 885 (5th Cir. 2020) (holding that two-and-one-half months between protected activity and adverse employment decision, standing alone, was not within the "very close" proximity necessary to establish causation"); *Clark*, 532 U.S. at 273-74 (holding temporal proximity of three to four months can satisfy prima facie burden on causation); *but see Wooten McDonald Transit Assocs., Inc.*, 788 F.3d 490, 499 and n.6 (5th Cir. 2015) (holding seven months between the protected act and the adverse action was enough to satisfy the prima facie causation burden).

Because Sullivan fails to raise issues of fact on any of the elements of his prima facie case, the Court need not address whether the reason given for Sullivan's termination was pretextual.

**Recommendation**

The Court should grant Defendant City of Dallas's Motion for Summary Judgment [Dkt. No. 78] and dismiss Plaintiff Paul Sullivan's claims with prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed

determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 15, 2024

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE